##### OF THE

# COURT OF APPEALS

#### OF THE

## STATE OF COLORADO.

---

## JANUARY TERM, 1895.

OWERS ET AL. v. THE OLATHE SILVER MINING COMPANY (LIMITED) ET AL.

1. LIMITATIONS.

The bar of the statute of limitations is a personal privilege to be relied upon or not, as the defendant may choose.

2. PRACTICE—AMENDMENTS.

The statute of limitations being a strict defense, if a party omit to plead it the court will not allow him to amend by adding that plea.

3. RECORD—NOTICE.

Though not acknowledged or proven according to law, deeds and mortgages conveying or incumbering real estate are from the date of record notice to subsequent purchasers and incumbrancers.

4. EVIDENCE.

If books and papers necessary as evidence in one state be in the possession of a person in another, secondary evidence, without further showing, may be given to prove the contents of such papers, and notice to produce them is unnecessary.

5. EVIDENCE—CORPORATE SEAL.

The seal of a corporation affixed to a deed is *prima facie* evidence of the due execution thereof.

*Appeal from the District Court of Lake County.*

APPELLANTS were defendants below;—a suit in equity brought by trustees to foreclose a deed of trust upon forty (40) acres of mining land in the county of Lake, to secure payment of debenture bonds for £25,000, issued in England. In May, 1881, the defendant, The Olathe Silver Mining Co. (Limited), was organized in London under the joint-stock company acts of England of 1860 to 1880.

About the middle of July, 1881, the company purchased from one George Berry the forty acres of mines above mentioned for £100,000 sterling, £50,000 of which was to be paid in cash and £50,000 in shares of the company. Berry conveyed the property by deed. The company paid of the purchase price 50,000 shares of the capital stock and £31,140 cash, leaving a balance due Berry of £18,860.

By the articles of association the company was authorized to borrow money, issue debenture bonds in payment, and secure the same by mortgage upon its property. The sum of £18,860 due and owing to Berry, remaining unpaid, on the 17th of July, 1882, Berry agreed to take 1,886 mortgage debenture bonds of £10 each in full satisfaction and discharge of his debt. On the 24th of July, 1882, the board of directors of the company met, and by a resolution of that date concluded to issue debenture bonds to the amount of £25,000, secured by mortgage upon the property of the company above mentioned, of which amount Berry was to receive bonds to the value of £18,860, and the proceeds of the remaining bonds, amounting to £6,140, were to be sold or used for obtaining money for development and working capital.

A mortgage of the forty acres of mineral land in Lake county was executed to secure the £25,000 issue of bonds. Shortly after its execution, the deed of conveyance from Berry to the company was recorded in Lake county, in this state, and on the 21st of October, 1882, the deed of trust or mortgage was filed for record in the same county.

The bonds of Berry were delivered to and received by him. Of the remaining bonds, 218 were sold for cash at par value, and 110 were deposited with creditors as security; the total

number of bonds issued being 2,214 of £10 each, drawing interest at eight per cent per annum. Of the bonds issued by the company, 2,500 of £10 each had six coupons attached, each for the payment of one half year's interest. Thomas Eyre Foakes, Herman Carl Schultz and Theodore H. Lowe were made trustees in the deed of trust. On November 19, 1885, Schultz died, and Harold Carter was appointed to succeed him. On May 20, 1886, Foakes resigned, and Thomas A. Masey was appointed his successor; and before the bringing of this suit Masey resigned, and John Gaskell was appointed his successor.

The number of bonds held by the plaintiffs at the time of bringing suit aggregated 1,257 of £10 each, amounting to £12,570, interest upon them £6,513; total, £19,083, or, in round numbers in federal currency, over $95,000. The bonds were due and payable on the first day of August, 1885. The company defendant made default, and paid neither principal nor interest.

Appellants Owers, Scott and Manning, and some others, claimed to be the owners of the mortgaged mining property as tenants in common;—*First*, by virtue of a sale of the property made on the 14th day of December, 1884, by the sheriff, under an execution against the property of the defendant company, and a conveyance under such sale; *second*, defendant Owers claimed a lien upon the property by virtue of a judgment against the defendant mining company for $2,000, date not given, but long subsequent to the execution and record of the deed of trust.

While this action was pending, in June, 1891, the defendant company went into voluntary liquidation under the winding-up acts. An officer appointed by the high court of chancery was put in charge of its affairs, and everything pertaining to it.

By the complaint it was prayed that the priority of different liens be decreed, and strict foreclosure had under the trust deed.

The defendant, the Olathe Company, filed an answer by the

defendant Owers, appearing as its attorney, on November 18, 1889. Defendant Owers filed his answer November 22, 1889. The answer of defendants Scott and Manning was filed January 29, 1890. By the answer of the Mining Company its corporate existence and the purchase of the mining property as alleged in the complaint was admitted, and a general denial of all other allegations. For a special defense it was alleged that it never received any consideration for any of the bonds mentioned in the complaint, etc. In the answer of the defendant Owers he claimed to be an owner of an undivided one fourth ($\frac{1}{4}$) interest in the property by virtue of a sheriff's sale made in 1884, from which he deraigned his title; that he also claimed a lien upon the property by a judgment obtained against the company for $2,000, in March, 1885. Manning and Scott answered that they each were owners of an undivided one eighth ($\frac{1}{8}$) of the property, with titles under the same judgment and sale in 1884 as alleged by Owers. Replications were filed to these answers March 13, 1890.

On July 30, 1891, defendant Owers made application to file amended answers for himself, Manning and Scott, based upon his own affidavit, and tendered the proposed amended answer of himself, in which, in addition to the allegations contained in his former answer, he pleaded the statute of limitations of three years, and also the general statute of limitations of six years. On August 13, 1891, the court denied the application for leave to file a plea under the three years statute of limitations, and allowed a plea of the general statute of limitations to be filed, which was filed; and the answer of Manning and Scott was amended in the same manner. Defendant Owers also alleged in his answer that in 1883 he was regularly appointed attorney of the defendant company; that the officers, through collusion and conspiracy, claim such appointment was revoked, and asked leave to file the answer of the defendant company, and defend it, by virtue of being *a stockholder*. Upon this application no order appears to have been made.

A trial of the case was had upon the evidence of the plaintiffs, defendants offering none, resulting in a judgment for the plaintiffs, and a decree declaring the deed of trust a valid and existing mortgage and the prior lien upon the property, and ordering the property to be sold without redemption by the trustees to satisfy the claim of the plaintiffs. The court also found that the defendant Owers was the owner in fee of one fourth ($\frac{1}{4}$) and Manning and Scott of one eighth ($\frac{1}{8}$) of the property, but that such title and interest was subject to the mortgage and indebtedness involved in this suit.

Mr. J. W. TAYLOR, Mr. HARVEY RIDDELL and Mr. J. M. MAXWELL, for appellants.

Mr. C. C. PARSONS and Mr. F. L. BALDWIN, for appellees.

REED, J., delivered the opinion of the court.

Although the finding of the court was that Owers was the owner of the undivided one fourth and Manning and Scott each owners of one eighth, such finding was harmless, as the court further found such interests were subject to the lien of the deed of trust; but we are at a loss to know upon what the court based its decree of such ownership. It was alleged in the pleadings, and the interest of Owers stated in his affidavit filed in support of his motion to amend the answer, but no proof was offered in support of or to establish any title or lien in any of the three defendants who attempted to contest plaintiffs' suit; nor was any proof offered to establish the claim of Owers that he was a stockholder. Consequently, as far as they were concerned, the result was equivalent to a default. The appearance of Owers for the defendant Mining Company was at least questionable. No authority was shown. It was stated in his affidavit that he was duly appointed in 1883 as the attorney, but the officers, by "conspiracy and collusion," claimed such relation or au-

thority had been revoked, but at what time is not stated. He afterwards asked to be allowed to defend for the company, as its attorney, by reason of his being a stockholder; and that he was a stockholder was never proved, nor the motion granted. As he, in the year 1884, as alleged, commenced to assert title through a judgment and sale of the property, and shortly after obtained a judgment for $2,000 against his client, which he asserted as a lien, it would seem that, if the authority had not been revoked by the company, his own acts of antagonism were sufficient to sever the relation. His acts were so inimical to the rights and interests of his clients as to conclusively show the ending of the relation, and his knowledge and acquiescence;—and in his affidavit, filed July 30, 1891, he alleges that at the time of filing the answers of himself, Manning and Scott, as late as January, 1890, he was ignorant of the default of the company in payment of interest, and the voluntary dissolution of the company. In the conduct and disposition of this suit his interests were so opposed to his alleged client, the Mining Company, that his own defense and that of the company were incompatible. Had the attention of the court been called to it, or his authority to appear called for, it must have resulted in his answer for the company being stricken out, and a default taken against the company. As it was, his relation to the company being such as to preclude his appearance to represent it, and neither he nor his associated defendants having shown any interest in the property in controversy, the finding and decree must have gone as it did, as a matter of course. Except for the finding of the court that the parties had interests in fee, appellants would be regarded as volunteers in the litigation, without any legal standing in this court upon appeal.

Plaintiffs held in bonds of the company and accrued interest over $80,000 against the property. The alleged interests of the defendants was the result of a judgment of $500, divided into fourths and eighths, obtained after the mort-

gage and asserted as a title, adversely, while the principal defendant claimed to be the attorney.

The equity of the decree, under the circumstances, cannot be questioned, and we might with propriety stop at this point and affirm the findings and decree, but the zeal, labor and ability expended by counsel for appellants demand greater consideration and attention, and although the defense appears throughout to have been far more technical than substantial, it was maintained upon the trial with marked ability, and is urged in the same manner in this court.

There are sixteen assignments of supposed errors. The *first:* That the court erred in denying appellants' motion for leave to plead the repealed statute of limitations of three years. The *second* to the *fifth,* both inclusive, are specific allegations of error in the admission of evidence of the plaintiffs. The remaining eleven are general and formal. It seems hardly necessary, in assigning errors, to print a page or two of supposed errors dependent upon the preceding ones,—conclusions naturally and inevitably following the finding as to those alleged specifically.

Evidently the contention that the cause of action was barred by the general statute of limitations was abandoned, but in appellants' oral argument, at quite length, and in the printed argument of counsel, the contention is that the act repealing the statute of three years' limitation was unconstitutional and void ; consequently, that such statute was in force and available as a defense. Much time and labor was expended by counsel of appellees in resisting such contention.

The right to interpose the plea was based upon the affidavit of defendant Owers, filed July 30, 1891, in which he says that at the time of filing his answer, and those of Scott and Manning, * * * he was under the impression and belief that the three years' statute of limitations had been repealed, and that the act repealing it and fixing the time at six years was valid, and proceeds : " That the district court of Arapa-

hoe county has recently decided that the said act of 1879, which purports to repeal said section 1686, and to change the period of limitation from three to six years, is void, not having been properly enacted, and that said section 1686 is still in force," etc., and asked to file an amended answer setting up not only the three years' limitation, but also the general act of six years.

Although the district court may have held as stated, it not being a court of last resort, such decision was far from being conclusive of the question, and could hardly be deemed a proper basis for the action of a court of concurrent jurisdiction. It certainly could not be regarded as a reason for filing a plea of the six years' statute of limitations.

We do not intend to discuss or decide the constitutionality of the act repealing the three years' limitation act. Suit was instituted March 11, 1889. The supposed answer of the Olathe Company by defendant Owers was filed November 18, 1889; the answer of Owers, November 22, 1889; the answer of Scott and Manning, January 29, 1890; replications filed February 17 and March 19, 1890. The application to plead the statutes of limitation by amended answer was made July 30, 1891, nearly a year and a half after the issues had been made up.

In *Cross v. Moffat*, 11 Colo. 212, it was held: "This statute (of limitations) is a personal privilege to be relied upon or not as the debtor may choose. There is no legal presumption that he will elect to plead it." It may be waived, and where not pleaded in the first instance, it is presumed to have been waived.

"Another general rule of great practical importance is that the bar of the statute must be interposed by the diligence of the debtor *and as* early as possible." Wood on Limitations, sec. 7.

"The statute being a strict defense, if a party omit to plead it the court will not relieve him by allowing him to amend by adding the plea." Angell on Limitations, sec. 285; *Jackson v. Varick*, 2 Wend. (N. Y.) 294.

"The plea of the statute cannot be amended, though the amended plea is filed before the rule day has expired. But if the plaintiff amends his declaration, the defendant may plead the statute anew." *Johnson v. Green*, 4 Gill & J. (Md.) 381; *Reed v. Clarke*, 3 McLean (U. S. C. C. ), 480; *Nelson v. Bond*, 1 Gill (Md.), 218. "Nor will a default be taken off to allow the plea of the statute to be made." *Sheets v. Baldwin*, 12 Ohio, 120. And see *Cross v. Moffat, supra; McIver v. Morse*, 1 Cr. (U. S. C. C. ) 90; *Wilson v. Turberville*, 1 Cr. (U. S. C. C. ) 492; *Thompson v. Afflick*, 2 Cr. (U. S. C. C. ) 46.

It follows that, regardless of the questions presented in regard to the constitutionality of the repeal of the statute, the pleas not having been filed in apt time, the court was justified in refusing the amendment of the three years' statute, and it is to be presumed that his refusal was based upon that reason, and it might with equal propriety have been extended to the refusal of the plea of the general statute of six years.

It is ably urged and contended by counsel for appellants: *First*, that the court erred in admitting in evidence the record of the trust deed from the county records of Lake county; *second*, that the court erred in admitting in evidence the copy of the trust deed attached to the deposition of Kendrick; *third*, that the court erred in admitting in evidence the sworn copy of the articles of association of The Olathe Silver Mining Company, attached to the deposition of Kendrick.

In the affidavit of Owers it is said that Manning and Scott were ignorant of the facts stated in regard to the pleas of the statute of limitation; that if the said defendants had been aware of the facts, they would have each interposed the pleas. Nothing is said in regard to the interposition of the plea by the debtor, the Mining Company. In his answer he prays to be permitted to defend as a stockholder on behalf of the company, and make such answer as the company might or could make in the premises.

It clearly appears that after verifying and filing the an-

swer of the company as its attorney, Owers abandoned the claim to the position, and, so far as the company was concerned, it was without defense, and in default.   For the purposes of this opinion, Owers, Manning and Scott must be regarded as intervenors as between the bondholders seeking foreclosure and the mortgagor, tacitly confessing the justice of the claims. This remark becomes necessary in connection with the discussion of the questions raised, suggesting, as they do, the further question,—to what extent the defendants could go in a collateral attack upon the *bona fides* and regularity of corporate proceedings when the debtor (mortgagor) admits the justice and regularity of the claims, where the rights attempted to be asserted by the defendants originated long subsequent to the mortgage and the record of the same, which, according to the affidavit of Owers, occurred while he was the attorney of the company, and supposed to be looking after its interests. It also appears from his sworn statements that at the time of the purchase by him of the Britton and Gray judgment, and the sale to others of undivided interests in the property, he remained the attorney while asserting an adverse title, and afterwards brought the suit for services during the time he was obtaining, asserting and selling the adverse title, and obtained a judgment of $2,000, which he is now attempting to assert as a lien against the property.

A serious question is raised by his sworn statements of the facts in regard to his relations with the company.   Did not his course toward his client during the time of his employment preclude him from asserting any rights or title in the premises?   The suit was in equity, in which it is a fundamental maxim that he who seeks its aid must "show clean hands;" at least show his own conduct fair and honest, such as entitles him to equitable consideration.   The claim of title sought to be enforced by him was shown by himself to have been so antagonistic to his employer, and so in fraud of its rights, as to warrant a court in rejecting and disregarding it.

The question suggested in regard to the admission of evidence will be briefly discussed.   The Mining Company was a

foreign corporation organized under the laws of Great Britain. Its organization, its validity, and the validity of its proceedings as a corporate body were under the statutes of that government, and controlled by them; hence the laws of this state or the United States were inoperative in regard to the home administration of its corporate affairs. The land sought to be foreclosed was in this state; the proceeding for foreclosure was governed by the *lex loci.*

It is contended that the mortgage, not having been acknowledged as required by our statutes, could not be admitted in evidence, and that the court erred in admitting it. In *Holladay v. Dailey,* 1 Colo. 460, it was said, in regard to a deed of conveyance: " Whether it was acknowledged in conformity with the statute or not is a matter of indifference, for the acknowledgment is but a means of proving the execution and authenticating the record when the instrument shall be thereafter recorded; and the statute which requires it being in the affirmative, and without any negative implication to exclude the common law, the conveyance will be valid, as between the parties thereto and those having notice thereof, even though not acknowledged at all." The case was taken by writ of error to the supreme court of the United States, and there affirmed. 19 Wall. 606.

We are not aware that the doctrine there asserted, that the acknowledgment was but a means of proving the execution, —not the only means,—and, as between the parties *and those having notice,* would be valid without any acknowledgment whatever, has ever been questioned. The acknowledgment entitles it, under our statute, to record. The record is solely for the purpose of notice. The validity is in no way dependent upon either. The requirements are for the purposes of evidence only, and for the protection of creditors and subsequent incumbrances, *bona fide,* without notice. The question of notice is one of fact, and may, when necessary by reason of defective acknowledgment, be established by other competent evidence, aside from the record. Owers, who obtained

the entire adverse title, as the attorney of the company, was chargeable with notice at the inception of his supposed title.

At the time of the trial the company had been compelled to go into voluntary liquidation and be wound up. The high court of chancery had the jurisdiction, and was in possession of all the papers and records pertaining to the corporation; and although, by permission of court, access was had for the purpose of securing verified copies, it was shown by the testimony of two witnesses, and unquestioned, that the original papers could not be withdrawn from the custody of the court.

Section 217, Gen. Stats., is as follows: "Deeds, bonds and agreements in writing, for the conveying or encumbering of real estate, or any interest therein, shall be deemed from the time of being filed for record, notice to subsequent purchasers or encumbrancers, though not acknowledged or proven according to law, but neither the same, nor the record thereof, shall be read as evidence, unless subsequently acknowledged or proved according to law, or unless their execution be otherwise proved in the manner required by the rules of evidence applicable to such writings, so as to supply the defects of such acknowledgment or proof; this section shall apply as well to all such deeds, bonds and other writings heretofore recorded, as to those hereafter to be recorded."

Though not acknowledged or proven according to law, they are from *the date of record notice to subsequent purchasers or incumbrancers,* but neither they nor the record can be used as evidence, "*unless their execution be otherwise proved* in the manner required by the rules of evidence applicable to such writings." The section clearly allows and recognizes proof as at common law of their execution.

In Greenleaf Ev., sec. 557, in speaking of such documents as deeds, bills and notes, it is said: "These must be produced, and the execution of them generally proved, *or their absence duly accounted for, and their loss supplied by secondary evidence.*"

*In Burton v. Driggs,* 20 Wall. 134, it is said: "It is an axiom in the law of evidence that the contents of any writ-

ten instrument lost or destroyed may be proven by competent evidence. * * * It is well settled that if books or papers necessary as evidence in one state be in the possession of a person living in another state, secondary evidence, without further showing, may be given to prove the contents of such papers, and notice to produce them is unnecessary;" and such has invariably been held to be the law in different states. See *Burnham v. Wood*, 8 N. H. 334; *Beattie v. Hilliard*, 55 N. H. 428; *Harper v. Cook*, 1 Car. & P. 139; *Shepard v. Giddings*, 22 Conn. 282; *Bailey v. Johnson*, 9 Cow. (N. Y.) 115; *Mauri v. Heffernan*, 13 Johns. (N. Y.) 58; *Eaton v. Campbell*, 7 Pick. (Mass.) 10.

Carefully authenticated and verified copies were produced of every important paper necessary as evidence, including the charter of the company, its official acts, resolutions, etc., authorizing the mortgage, together with careful and elaborate proof of the personnel of the governing body, the execution of the paper under the corporate seal, and the reason added why the original paper was not produced.

It is technically urged that it was not shown that the mortgage was executed by the president or chairman of the board of trustees or directors. Courts are not to presume that there were such officers. Where it is shown that the paper was executed by the board of control, and the seal of the corporation affixed by the custodian by order of the board of control, it is sufficient.

Section 119 of the charter provides that the seal shall be evidenced by the signature thereto of one of the directors and the secretary. In this case it was evidenced by three directors and the secretary.

In *Lovett v. Steam Saw Mill Ass'n*, 6 Paige (N. Y.), 60, the learned chancellor said: " The seal of a corporation aggregate affixed to the deed is of itself *prima facie* evidence that it was so affixed by the authority of the corporation; especially if it is proved to have been put to the deed by an officer who was entrusted by the corporation with the custody of such seal. * * * And it lies with the party objecting to the

due execution of the deed to show that the corporate seal was affixed to it surreptitiously or improperly, and that all the preliminary steps to authorize the officer having the legal custody of the seal to affix it to the deed had not been complied with." See Kyd on Corp., 268; Angell & Ames on Corp., 115; Whart. on Ev., 694; *Clarke v. Imp. Gas Light Co.*, 4 Barn. & Ald. 315; *Doe v. Chambers*, 4 A. &. E. 410; *Burrill v. The Bank*, 2 Met. (Mass.) 166; *St. John's Church v. Steinmetz*, 18 Pa. St. 273.

This fundamental principle of the law of evidence appears to have been overlooked; also the other fact that the corporation was not the plaintiff, but a codefendant; hence the greater necessity of establishing by competent proof any fact of want of authority, irregularity or fraud in the transaction to vitiate the deed of trust, instead of reversing and throwing upon the plaintiffs the burden of proof of every fact in advance, and requiring it to anticipate every objection the ingenuity of counsel could suggest.

It follows that we do not think any serious error warranting a reversal occurred upon the trial. The judgment and decree were fully warranted by the facts and evidence. The claim of title as made by the defendants was not such as to appeal to the conscience of a chancellor, or such as to demand great consideration. The judgment of the district court will be affirmed.

*Affirmed.*